**3D SYSTEMS, INC., Plaintiff,**

v.

**ENVISIONTEC, INC., and Envisiontec GMBH, Defendants.**

Case No. 05–74891.

United States District Court,
E.D. Michigan,
Southern Division.

March 9, 2010.

Alan N. Harris, Susan M. Kornfield, Bodman, Ann Arbor, MI, Sidney David, Jonathan A. David, Lerner, David, Westfield, NJ, for Plaintiff.

R. Terrance Rader, Steven R. Hansen, Rader, Fishman, Bloomfield Hills, MI, for Defendants.

*MEMORANDUM AND ORDER ADOPT-ING REPORT AND RECOMMEN-DATIONS OF SPECIAL MASTER (Doc. Nos. 146, 153) AND GRANT-ING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT (Doc. No. 104) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDG-MENT OF INFRINGEMENT (Doc. No. 119)*

AVERN COHN, District Judge.

## I.  Introduction

This is a patent case involving the art of stereolithography. The background of the case is reflected in the *Markman Memorandum And Order* filed February 6, 2008 (Doc. No. 98). The case involves four patents: U.S. Patent No. 5,630,981 (the '981 Patent), Method for Production of Three–Dimensional Objects by Stereolithography; U.S. Patent No. 5,651,934 (the '934 Patent), Recoating of Stereolithographic Layers; U.S. Patent No. 5,902,537 (the '537 Patent), Rapid Recoating of Three Dimensional Objects Formed on a Cross–Sectional Basis; and U.S. Patent No. 4,999,143 (the '143 Patent), Method and Apparatus for Production of Three–Dimensional Objects by Stereolithograph.

Before the Court are motions for summary judgment on infringement; defendants have moved for non-infringement (Doc. No. 104) and plaintiff has moved for infringement (Doc. No. 119). The motions were referred to a special master for a report and recommendation (Doc. No. 126 and Doc. No. 151). The special master issued the following:

- The Special Master's Report and Recommendation on the Parties' Summary Judgment Motions (Amended to Include Table of Contents) (Doc. No. 146)

- The Special Master's Superseding Report and Recommendation on the Parties' Summary Judgment Motions (Doc. No. 153)

- The Special Master's Response to the Parties' Objections to His Report and Recommendation filed May 12, 2009 (Doc. No. 153–2)

- Genuine Issues of Material Fact That Require Trial (Doc. No. 153–3)

Briefly stated, the special master recommends that summary judgment of non-infringement by defendants' Prefactory and Vanquish devices be granted as to the '537 Patent and the '143 Patent, and further recommends that there are genuine issues of material fact regarding the claim of infringement of the '981 Patent (Prefactory and Vanquish device) and the '934 Patent (Vanquish device) which require trial.

Both parties filed objections and the Court held a hearing on the objections. The matter is ready for decision. For the reasons that follow, the report and recommendations of the special master will be adopted as the findings and conclusions of the Court on the parties infringement motions.

## II.  Background

A brief description of each of the four patents and its paradigm claim follows:

- '981 Patent—claim 11. Patent relates to stereolithography generally.
- '934 Patent—claim 2. Patent concerns, *inter alia*, a "smoothing element" or a *winged* blade that forms a uniform coating over each previously solidified object layer.
- '537 Patent—claim 81. Patent relates to the use of an applicator connected to a vacuum pump to "recoat" fresh curable liquid over each previously solidified object layer.
- '143 Patent—claim 35. Patent concerns the formulation of "removable supports" for the object.

There are two accused devices: the Prefactory machine and the Vanquish machine. Each machine is used to make three-dimensional objects based on a computer model. Each uses a digital light projector to selectively project light onto curable resin. In the Prefactory machine, the digital light projector is positioned below the curable resin. In the Vanquish machine, the build platform moves continuously downward and away from the digital light projector.

In the Memorandum of January 6, 2010 (Doc. No. 163), the Court described its understanding of the special master's recommendations and the issues in the case. *See 3D Systems, Inc. v. Envisiontec, Inc.*, 2010 WL 55505 (E.D.Mich. Jan. 6, 2010).

### III. Legal Standard

A district court must conduct a de novo review of the parts of a special master's report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1)(B). The district "court may accept, reject, or modify, in whole or in part the findings or recommendations" of a special master. *Id.*

### IV. Analysis

As an initial matter, no useful purpose would be served by an extended discussion of the infringement issues. The Court is satisfied that, notwithstanding the not-

withstanding the volume of papers filed in support and in opposition to the special master's recommendations, they should be followed. As such, what follows is a brief discussion of each patent.

### A. The '981 Patent

As to the '981 Patent, plaintiff does not take issue with the special master's recommendation that there are disputed issues of fact as to infringement which must be resolved by a trial.

Defendants' objections require reading limitations in the claim language that were rejected in the *Markman* phase of the case. As such, the objections are not well-taken.

The differences between voxelization and slicing is not easy to understand. There is ample evidence in the record that voxels forming layers in the Prefactory and Vanquish devices represent cross-sectional layers of the object to be formed. Whatever the difficulty in deciding whether voxelization and slicing is such that a finding of non-infringement is called for in contrast to being captured by Claim 11 of the '981 Patent, a properly instructed jury must make this decision.

### B. The '934 Patent

As to the '934 Patent, the special master observed the operation of the Vanquish device. He also heard argument on how it operates; he could not say for certain whether or not the blade contacts the uncured resin and what happens when it passes over the previously formed resin layer. He said a jury must decide this. The Court does not disagree.

This recommendation received more attention than any other recommendation of the special master. The special master discussed plaintiff's objections to a trial on the question of whether or not the blade in the Vanquish device contacts the resin in the Special Master's Response To The Parties' Objections To His Report And

Recommendation Filed May 12, 2009 (Doc. No. 153–2). Because of the Court's uncertainty following the hearing on the parties' objections, and particularly the plaintiff's powerpoint presentation at oral argument, the Court directed a supplemental paper be filed. *See* Supplemental Joint Statement of Material Facts With Respect to U.S. Patent No. 5,651,934 (Pursuant to the Court's Directive at the Hearing on January 11, 2010) (Doc. No. 164).

The Supplemental Joint Statement is highly argumentative, particularly defendants' Response statements and plaintiff's Reply statements. Whether there is a distinction between "contacting the material," as repeatedly stated in the text of the '934 Patent and "touching" the material, as stated in the several descriptions of the Vanquish device in action is an open question which cannot be resolved on the record as it stands. The meaning of the phrase "contacting the building material" was not raised in the *Markman* phase of the case.

Overall, there are genuine issues of material fact as to whether the Vanquish machine infringes Claim 2 of the '934 Patent.

### C. The '537 Patent

As to the '537 Patent, the special master reported that the cooling blades of the Vanquish device do not apply or disperse uncured building material, and therefore the device does not infringe. The Summary of Invention (col. 5, ll 22–25) says "... building material is supplied to the applicator or other device used to dispense building material are disclosed." To reject the special master's recommendation of non-infringement would effectively re-open claim construction. The special master's finding of non-infringement is correct.

Additionally, there was no prejudice to plaintiff in the manner in which the issue was raised. It had ample opportunity to ask that it be given more time to respond.

A fair read of *Averbach v. Rival Mfg.*, 879 F.2d 1196 (3d Cir.1989), which plaintiff cites in support of its prejudice argument is inapposite; the circumstances in *Averbach* are far different than those here.

### D. The '143 Patent

As to the '143 Patent, the special master's finding that the Vanquish device's support is not web-shaped, and therefore there is no infringement is correct. As stated by the special master:

> ... the support structures in the Vanquish and Prefactory machines include a base that is perforated in part with non-uniform diamond shaped holes and teeth at the point of contact with the part to facilitate removal of the part form the support.
>
> In contrast, the inventive supports of the '143 Patent are provided in the form of "webs." Webs, in cross section are long slender rectangular structures. The width of a web is designed thin enough to be easy to remove from the part after post curing. The length of a web is designed to meet two requirements: (1) long enough to give good adhesion to the elevator platform (without need of a base), and (2) long enough to span the cross-section of the object (to give support to cross-hatch and the boundaries enclosing it). ('142 Patent, col. 6, ll. 52–[6] 1)

Special Master's Superceding Report and Recommendations on the Parties' Summary Judgment Motions (Doc. No. 153) at p. 32.

### V. Conclusion

### A.

Accordingly, the report and recommendations of the special master are ADOPTED as the findings and conclusions of the Court on the parties' infringement motions.

Defendant's motion for summary judgment of non-infringement is GRANTED

IN PART AND DENIED IN PART as follows:

Summary judgment of non-infringement of the '537 Patent and the '143 Patent by the Prefactory device and the Vanquish device is GRANTED.

Summary judgment of non-infringement of the '981 Patent by the Prefactory device and the Vanquish device is DENIED.

Summary judgment of non-infringement of the '934 Patent by the Vanquish device is DENIED.

Plaintiff's motion for summary judgment of infringement is DENIED.

**B.**

A status conference will be held on Monday, April 12, 2010, at 2:00 pm to set the course of this case to trial. *See* Genuine Issue of Material Fact That Requires Trial (Doc. No. 153–2).

SO ORDERED.

### SPECIAL MASTER'S REPORT AND RECOMMENDATION ON THE PARTIES' SUMMARY JUDGMENT MOTIONS

ROBERT NEUNER, Special Master.

### (AMENDED TO INCLUDE TABLE OF CONTENTS)

## TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | 679 |
| I: INTRODUCTION | 679 |
| II: THE PATENTS AT ISSUE | 680 |
|     A. General Allegations | 680 |
|     B. Disclosures of the Four Patents | 680 |
|         1. The '981 Patent | 680 |
|         2. The '934 Patent | 683 |
|         3. The '537 Patent | 684 |
|         4. The '143 Patent | 686 |
| III: THE ACCUSED PERFACTORY AND VANQUISH MACHINES | 686 |
| SUMMARY JUDGMENT | 688 |
| IV: INFRINGEMENT OF THE '981 PATENT | 688 |
|     '981 Claim Terms and Limitations 1–4 and 7 | 689 |
|     '981 Claim Limitations 5 and 12 | 689 |
|     '981 Claim Limitations 6, 8–11 and 13 | 690 |
| V: INFRINGEMENT OF THE '934 PATENT | 691 |
|     '934 Limitation 1 | 691 |
|     '934 Limitations 2, 3, 4, 5, 10, 11 | 692 |
|     '934 Limitations 6, 7, 8, 9 | 692 |
| VI: INFRINGEMENT OF THE '537 PATENT | 693 |
|     '537 Limitations 1–3, 5 and 11 | 693 |
|     '537 Limitations 4, 12, 13 | 693 |
|     '537 Limitations 6, 7 and 8 | 694 |
|     '537 Limitation 9 | 694 |
|     '537 Limitation 10 | 695 |
| VII: INFRINGEMENT OF THE '143 PATENT | 695 |
|     '143 The Preamble (Limitations 1–3) | 695 |
|     '143 Limitations 4 and 5 | 696 |

'143 Limitation 6 ................................................696
'143 Limitation 7 ................................................696
'143 Limitation 8 ................................................697
    a.  receiving the support representation ...................................697
    b.  [forming] the three-dimensional object out of the medium................697
    c.  [forming] the support out of the material layer in accordance with the
       object and support representation ..................................698
CONCLUSION ....................................................698

*TABLE OF AUTHORITIES*

Page(s)

A.B. Chance Co. v. RTE Corp.,
    854 F.2d 1307 (Fed.Cir.1988) ...............................................688
Comark Communications, Inc. v. Harris Corp.,
    156 F.3d 1182, 48 USPQ 2d 1001 (Fed.Cir.1998)...............................694
O.I. Corp. v. Tekmar Co.,
    115 F.3d 1576, 1582, 42 USPQ 2d 1777, 1781 (Fed.Cir.1997)....................694

## I. *INTRODUCTION*

This is a patent case in Which plaintiff, 3D Systems, Inc. ("3D" or "3D Systems"), has sued defendants, Envisiontec, Inc, Envisiontec GmbH, and Sibco, Inc. (collectively "Envisiontec"), for infringement of twelve patents. The patents in suit are directed to "stereolithography," a term that is said to have been coined by one of 3D's inventors, Charles W. Hull. The term denotes the application of lithographic techniques to the production of three-dimensional objects by solidifying successive cross sections of the object at the surface of a fluid medium in response to appropriate synergistic stimulation, such as electromagnetic radiation, *i.e.*, light or reactive chemicals. Combined, the successively solidified cross sections form the three-dimensional object.

Of the twelve patents and their myriad claims, the district court, *per* Hon. Avern Cohn, ordered 3D to designate for trial four patents and one claim from each. 3D designated claim 11 of U.S. Patent No. 5,630,981, entitled "Method for Production of Three–Dimensional Objects by Stereol-

ithography"; claim 2 of U.S. Patent No. 5,651,934, entitled "Recoating of Stereolithographic Layers"; claim 81 of U.S. Patent No. 5,902,537, entitled "Rapid Recoating of Three–Dimensional Objects Formed on a Cross Sectional Basis"; and claim 35 of U.S. Patent No. 4,999,143, entitled "Methods and Apparatus for Production of Three–Dimensional Objects by Stereolithography".[1]

On February 20, 2007, the undersigned was appointed Special Master to conduct a *Markman* proceeding and to recommend the appropriate interpretation of the disputed claim terms. A *Markman* hearing was conducted on April 5, 2007. The hearing began with a short tutorial by the parties and concluded with argument by counsel on a patent-by-patent basis as to the proper construction of the disputed claim terms.

I filed my report and recommendation on May 15, 2007. Each party filed objections to the report and then replied to the other party's objections. Judge Cohn reviewed my report and considered the parties' objections to it. On February 6, 2008,

---

1. The patents are referred to herein as the '981, '934, '537 and '143 patents, respectively. Copies of the patents, the '981 (in full); the '934 (without the software reproduced in columns 25–230); the '537 (in full); and the '143 (Without appendices) are attached as Exhibits 1, 2, 3 and 4.

the Court entered its Markman Memorandum and Order. (Dkt. 98).

Not surprisingly, the plaintiff and the defendants each moved for summary judgment of infringement and noninfringement, respectively, of the '981, '537, '143 and '934 patents based on the Court's claim construction rulings. 3D Systems also moved for an order disqualifying Dr. Paul F. Jacobs from serving as Envisiontec's expert witness. Formerly 3D Systems' Director of Research & Development, Dr. Jacobs submitted a declaration in support of Envisiontec's summary judgment motion.

On October 1, 2008, the Court granted 3D Systems' motion disqualifying Dr. Jacobs. (Dkt. 116). Defendant promptly moved for reconsideration of the order. On October 31, 2008, the Court entered an order staying further proceedings on the motion for reconsideration pending the appointment of a special master and the receipt from the special master of a report and recommendation on the appropriate disposition of the parties' summary judgment motions and a recommendation as to whether or not Dr. Jacobs should be disqualified either at the summary judgment phase of the case or at trial of at both. I was appointed on November 6, 2008. (Dkt. 126). A hearing was conducted on March 17, 2009.

This paper will address the parties' summary judgment motions. In a separate paper, filed concurrently herewith, I address the Jacobs disqualification issue.

## II. THE PATENTS AT ISSUE

### A. *Overview*

The four designated patents are all directed to the stereolithographic process. The '981 Patent relates to stereolithography in general; the '934 Patent concerns, *inter alia*, a "smoothing element" or winged blade that forms a uniform coating over each previously solidified object layer; the '537 Patent relates to the use of an applicator connected to a vacuum pump to "recoat" fresh curable liquid over each previously solidified object layer; and the '143 Patent concerns the formation of "removable supports" for the object.

### B. *Disclosures of the Four Patents*

### 1. *The '981 Patent*

Figures 1 and 2 of the '981 Patent are self-explanatory flowcharts that illustrate the basic concepts of stereolithography.[2]

---

2. A more detailed summary of the basic steps of a stereolithographic process is provided in the '934 Patent:

1. Generation of a three-dimensional object design in a CAD system and storage of the design data in a CAD file;
2. Compiling data from the CAD file into numerous thin "slices" each representing a thin cross-sectional layer of the three-dimensional object;
3. Transfer of the compiled CAD data to a Stereolithographic Apparatus ("SLA");
4. Coating a layer of building material adjacent to a previously formed object cross section. The building material layer is preferably uniformly coated at an appropriate thickness so that the subsequently formed object cross section meets tolerance requirements;
5. Selectively exposing the building material layer to synergistic stimulation to solidify or otherwise physically transform the building material layer at those locations which collectively represent the object cross section to be formed;
6. Repeating steps (4) and (5) to alternately form successive building material layers and object cross sections until the three-dimensional object is formed; and
7. Post processing the newly-formed object by removing residual building material clinging to the object, removing the object from the platform on which it was formed, exposing the object to additional synergistic stimulation to ensure complete solidification of the building material and removing supports.

FIG. 1

FIG. 2

According to the '981 Patent, "Many liquid state chemicals are known which can be induced to change to solid state polymer plastic by irradiation with ultraviolet light (UV) or other forms of synergistic stimulation such as electron beams, visible or invisible light, reactive chemicals applied by ink jet or via a suitable mask" ('981 Patent, col. 4, ll. 38–42).

A preferred embodiment of a stereolithographic system (col. 4, ll. 15–17) is shown in FIG. 3 of the '981 Patent:

FIG. 3

As depicted in FIG. 3, container 21 holds a photocurable liquid 22 (i.e., a liquid that can be polymerized or cross-linked to solidify upon exposure to light). The '981 Patent describes the curing process as follows:

The light source 26 produces the spot 27 of UV light small enough to allow the desired object detail to be formed, and intense enough to cure the UV curable liquid being used quickly enough to be practical. The source 26 is arranged so

it can be programmed to be turned off and on, and to move, such that the focused spot 27 moves across the surface 23 of the liquid 22. Thus, as the spot 27 moves, it cures the liquid 22 into a solid, and "draws" a solid pattern on the surface in much the same way a chart recorder or plotter uses a pen to draw a pattern on paper.

(Col. 7, ll. 20–30).

Additional systems for implementing stereolithography are depicted in FIGS 4–8. In FIG. 4, the object is formed from a UV light source positioned below the transparent lower wall of the container and pulled up from the liquid 22, rather than down and further into the liquid medium, as in FIG. 3. The UV light source 26 focuses the spot at the interface between the liquid 22 and a non-miscible and transparent liquid 32 on which the liquid 22 floats.

In FIG 5, the movable UV light source 26 of FIG. 3 is eliminated and a stationary, collimated, UV light source 35 and suitable apertured mask are substituted for the programmed source 26 and focused spot 27. The apertured mask 36 is placed as close as possible to the working surface 23, and the collimated light from the UV source 35 passes through the mask 36 to expose the working surface, thereby creating successive cross sections of the object, as in the embodiments of FIGS. 3 and 4. (Col. 9, l. 65 to col. 10, 1–2).

FIG. 6 shows a system in which a cathode ray tube (CRT) 38, fiber optic faceplate 39, and a release layer are provided as a substitute for the light source 26 and focus spot 27 of FIGS. 3 and 4. Finally, FIGS. 7 and 8 are identical to FIG. 3 except that in FIGS. 7 and 8 the elevator platform 29 has an additional degree of freedom. Adjustable elevator platform 29a allows for the manual or automatic control of rotation about a pin or hinge 42. The rotation permits an "add-on" process whereby a supplementary, stereolithographically-formed structure is selectively formed as an addition to one side of the three-dimensional object. (Col. 10, ll. 24–42).

### 2. *The '934 Patent*

The '934 Patent is directed to the recoating step of the stereolithography process where, after a layer of building material is cured, a new layer of uncured liquid is applied over it. Because of the viscosity of typical photocurable liquids, it can take a considerable amount of time for gravity to level the liquid, resulting in longer object build times.

FIG. 2 of the '934 Patent illustrates an embodiment of a stereolithographic device using a doctor blade 26 mounted on the top of tank 10. The blade 26 is adapted to move horizontally across the top of the tank, (Col. 8, ll. 27–28). As it moves, the blade smoothes the surface to create a uniform coating over a previously formed layer of the object. "[D]octor blades provide means to reduce the cycle time for forming each layer of plastic." *Id.* at Col. 3, ll. 40–41.[3]

FIG. 2.

The patent describes several blade designs. FIGS. 26 and 27a depict two different embodiments of a "winged blade" design:

---

**3.** Doctor blades are said to have drawbacks which are discussed in detail at col. 3, l. 40– col. 5, l. 52.

FIG. 26.

FIG. 27a

### 3. The '537 Patent

The '537 Patent also relates to the recoating step in the stereolithographic process. The invention is directed primarily to improved methods and apparatus for coating a building material layer adjacent to a previously formed object cross section in preparation for forming a subsequent object cross section. (Background of the Invention, col. 2, ll. 36–39).

The '537 Patent discloses, *inter alia,* a recoating technique whereby an applicator is used to simultaneously apply and smooth a building material layer. The liquid is drawn up into the applicator by a vacuum pump:

[T]he resin volume in applicator 310 is maintained by vacuum pump 321, the pressure regulator 323, and vacuum feed line 325. The application of vacuum through line 325 in the upper portion of cavity 327 of applicator 310 causes a pressure differential to occur between the inside of cavity 327 and the region outside applicator 310. Applicator 310 is sealed with the exception of one or more openings near its top and with the further exception of opening 315 at its bottom. The openings near the top of applicator 310 provide for connection to vacuum feed line 325, while the opening at the bottom forms a slit for applicator 310 to receive and dispense building material 16.

*Id.* at col. 38, ll. 20–32.

FIGS. 9a and 9b of the '537 Patent illustrate the positioning of such an applicator 310 prior to (FIG.9a) and during (FIG.9b) the dispensing of liquid material 16.

**FIG. 9a**

**FIG. 9b**

The '537 Patent describes the recoating process as follows:

> [A]pplicator 310 *simultaneously applies and smoothes a building material layer 24.* In a first preferred embodiment of this technique, after the last formed object cross section 20 has been formed by selectively exposing the building material to synergistic stimulation, object 12 is dipped one layer thickness, or other desired thickness, below the desired working surface 26 of building material 16. During the exposure process, applicator 310 is at least partially filled with material 16 and after the exposure process, applicator 310 is swept at or slightly above the desired working surface 26 while dispensing material from opening 315 to form building material layer 24. After dispensing of material 16, the vertical position of the upper surface 22 of the last formed object cross section 20 may be adjusted if necessary so that it is essentially one layer or other desired thickness below the desired working surface 26.

Col. 37, ll. 48–64. (Emphasis supplied)

As FIGS. 9a and 9b illustrate, applicator 310 dispenses layers of photocurable liquid 16. Further, a meniscus 331 forms and bridges a gap between the working surface 26 of the photocurable liquid and the bottom of applicator 310. The meniscus seals the applicator, and "as the pressure differential forms due to application of a vacuum at the top of the applicator 310, building material will be drawn up into applicator 310 until the pressure differential outside and inside applicator 310 is zero." *Id.* at col. 38, ll. 39–45.

#### 4. *The '143 Patent*

According to the '143 Patent, "stereolithography parts are preferably built on structures known as supports, rather than directly on the elevator platform." Col. 8, ll. 12–13. The '143 Patent is directed generally to an improved support design that overcomes the problems experienced in the prior art, such as support strength limitations and required curing time. *Id.* at col. 13, ll. 14–20.

The invention of the '143 Patent provides supports in the form of "WEBS," which, in cross section, are long slender rectangular structures. *Id.* at col. 6, ll. 52–54. "The width of a web is designed thin enough to be easy to remove from the part after post curing. The length of a web is designed to meet two requirements: (1) long enough to give good adhesion to the elevator platform (without need of a base), and (2) long enough to span the cross section of the object (to give support to cross-hatch and the boundaries enclosing it)." *Id.* at col. 6, ll. 56–61.

FIG. 9 (in part) depicts an embodiment of supports for what is said to be a "teacup." *Id.* at col. 16, ll. 10–15.

FIG 9

"Generally, supports are designed as a single CAD [computer-aided design] file separate from the part file." Col. 16, ll. 24–25. "The object and support files are merged and drawn as a single file later in the stereolithography process." *Id.* at col. 16, ll. 27–29. Along with the data file for the part itself, the support files are "sliced" in a computer through the use of slicing software (SLICE).

#### III. *THE ACCUSED PERFACTORY AND VANQUISH MACHINES*

Defendants' Perfactory and Vanquish[4] devices are used to make three-dimensional objects based on a computer model. They employ a curable resin that solidifies when light is applied to it. The process each machine employs is described by Envisiontec as "voxelization". The first step in the voxelization process is to create a build volume based upon the minimum resolution required when building the three-dimensional object. The build volume is then subdivided into a large number of grid volumes. The grid volumes are called voxels.

---

4. The Vanquish machine was recently renamed "Perfactory–Xtreme" for a one projector model and "Perfactory–Xede" for a two projector model. For ease of reference, the Vanquish name will be used in this report.

The next step in the software is to determine the overlap between each voxel and the three-dimensional object. Depending on the amount of overlap between the object and the voxels in the build volume, each voxel will be assigned a brightness intensity value. The brightness intensity values (grayscale values between 0) (no overlap) and 255 (complete overlap) are used to generate a volumetric model of the three-dimensional part. The volumetric model is sampled repetitively along a selected axis to generate bitmaps within the build volume. Each bitmap is a blueprint for the selective illumination of a section of the curable resin. There are as many bitmaps as there are sections that compose the three-dimensional object.

The Perfactory and Vanquish devices produce three-dimensional objects by using a "digital light projector" or "DLP" to selectively project light onto the resin. In each machine the DLP includes a matrix of 1400 × 1050 micromirrors. Each micromirror is separately addressed and controlled by the bits composing the bitmap. Each reflects onto a voxel location an amount of light (0 to 255) that represents the overlap between the voxel and the three-dimensional object. After the voxel

locations in the resin are cured to their prescribed depths in accordance with the intensity of the light beams reflected by the micromirrors, fresh resin is supplied over (Vanquish) or under (Perfactory) the cured resin and the process repeats itself until the object is built.

In the Perfactory machine, the digital light projector is positioned below the curable resin. In the build process, fresh resin is cured by the light beams reflected by the micromirrors at locations and to depths controlled by an associated bitmap. After the resin is selectively solidified, it is moved upwardly and away from the digital light projector. Fresh resin is then allowed to flow between the solidified resin and the DLP. The build process is repeated until the three-dimensional object is built.

In the Vanquish devices, the build platform moves continuously downward and away from the DLP. Light from the DLP projector is always on. As in the Perfactory device, fresh resin is cured by the light beams reflected by the micromirrors at voxel locations and to depths controlled by an associated bitmap. As the Vanquish build platform moves downwardly, the pre-

viously cured resin also moves downwardly allowing uncured resin to flow over it. A cooling blade moves intermittently across the upper surface of the resin. The blade is moved by a system of dual rubber belts that are driven by a rotating shaft.

Both Perfactory and Vanquish include software for generating "support" structures beneath the part. The supports have perforations in them to prevent the viscous resin from damaging the supports during the build process. They also include "teeth" at the point of contact with the part to facilitate removal of the part from the support:

## SUMMARY JUDGMENT

Rule 56(c) Fed R. Civ. P. provides that a motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." All doubts are to be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307 (Fed.Cir.1988).

If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. Fed. R.Civ.P. 56(d)(1). In the Appointment and Order of Reference to Special Master, Judge Cohn has directed that I "clearly specify what are the genuine issues of material fact that require trial."

## IV. INFRINGEMENT OF THE '981 PATENT

Claim 11 of the '981 Patent reads as follows, with disputed claim terms numbered and appearing in bold face:

(1) A method of **producing a three-dimensional object** from a [medium] *photopolymer* capable of selective physical transformation.

(2) when **subjected to [prescribed radiation]** *light* said method comprising the steps of:

(3) providing said [medium] ***photopolymer:***

(4) **providing said [prescribed radiation]** ***light;***

(5) **providing data representing the three-dimensional object to be formed which was generated on CAD system;**

(6) **forming a first cross sectional layer** of structure by

(7) **exposing said [medium]** ***photopolymer*** **to said [prescribed radiation]** ***light;***

(8) **forming successive layers of [medium]** ***photopolymer*** adjacent to any

(9) **previously formed cross sectional layers** of structure

(10) **forming and adhering successive cross sectional layers** of structure

(11) **to any previously formed cross sectional layers** by

(12) **exposing said medium to said prescribed radiation in response to said data,**

(13) whereby a **plurality of adhered cross sectional layers** of *structure form the three-dimensional object.*

As discussed herein, it is undisputed that defendants' Perfactory and Vanquish machines practice steps 1–4 and 7 of claim 11. While disputed by Envisiontec, I also find that the Perfactory and Vanquish machines practice steps 6–11 and 13 of claim 11. However, genuine issues of material fact exist as to whether the Perfactory and Vanquish machines practice steps 5 and 12 of patent claim 11. Thus, as to patent claim 11, I recommend that the parties' respective motions for summary judgment be denied.

### Claim Terms and Limitations 1–4 and 7

The Perfactory and Vanquish machines produce three-dimensional objects by pro-

jecting light onto a curable resin using a digital light projector. The DLP includes an array of micromirrors, each of which projects light of a predetermined intensity to a specific location on the curable resin for a predetermined period of time. This method of operation satisfies limitations 1–4 and 7.

### Claim Limitations 5 and 12

5. Providing data representing (adjacent cross sectional layers of) [5] the three-dimensional object to be formed which was generated on CAD system;

12. Exposing said medium to said prescribed radiation in response to said data.

3D Systems case for infringement of claim limitations 5 and 12 is based generally on numerous admissions and contradictory statements made by Envisiontec, the testimony of Dr. Sebastian Magda, one of Envisiontec's expert witnesses, and the testimony of its own expert, Dr. Brent E. Stucker. 3D Systems argues persuasively that each bit or square of the bitmaps derived in the Perfactory and Vanquish machines will have assigned to it an intensity or grayscale value from 0–255. The grayscale value determines the intensity of light that each micromirror reflects onto the surface of the resin at the micromirror's corresponding voxel location. Each bitmap thus causes a selective solidification of a section of the three-dimensional object.[6] In doing so, the bitmaps provide data representing adjacent cross-sectional layers of the three-dimensional object.

Envisiontec's answer is that a voxel curing process differs fundamentally from the stereolithographic process patented by 3D Systems. For instance, according to Dr. Paul F. Jacobs, the Perfactory and Van-

---

**5.** The parentheses denote the Court's construction of this limitation.

**6.** Envisiontec has used in various documents the terms "layer", "master plane", "slice", "voxel plane" and "voxel matrix" to describe these cross sections of the object.

quish machines do not "technically produce layers" or generate layers in the "normal sense" (Jacobs Decl. ¶ 6, Dkt. 134). Defendants' Chief Executive Officer, Mr. A.E. Siblani states that "unlike the two-dimensional stereolithography methodology that is described in the patents at issue, the individual data point information is not provided to the individual mirrors on the DLP projector as a layer nor does the information represent adjacent layers." (Siblani Decl. ¶ 12. Dkt. 132).

It seems to this author that Envisiontec and its witnesses are reading limitations into the disputed claim terms 5 and 12 that do not exist and this Court specifically found not to exist. Nonetheless, I cannot recommend a finding of infringement as to these limitations. The doubt here arises from the apparently inconsistent statements made by 3D Systems about the patentable differences between voxels and the two-dimensional data that is disclosed in 3D Systems' patents.

For instance, in the file history for 3D Systems' '662 patent (one of the patents in suit but not a paradigm patent), 3D Systems distinguished voxelization from its patent claims as follows:

> Applicant also wishes to bring European Patent Application 87304865.6, applied for by Scitex Corporation LTD., and published December 23, 1987, to the Examiner's attention. A copy of this reference is enclosed along with a Form PTO–1449 listing this reference. Applicant respectfully submits that the claims are patentably distinct over Scitex, since Scitex employs conversion of CAD/CAM data into defined data points which translate into cubic voxels. Scitex as well does not teach or disclose the conversion of CAD/CAM data at intersections with planes corresponding to slic-

ing layers. (emphasis added). (Siblani Decl., Exhibit 2, Dkt. 132).

In an earlier lawsuit against Aaroflex, 3D Systems argued in like vein that a prior art reference, *Pomerantz,*

> describes a system in which objects are represented by voxels (a voxel is the three-dimensional equivalent of a television pixel), rather than the surface data used and claimed in the 3D patent. The differences between this prior art and 3D's patent claims simply are not self-explanatory; they require expert testimony that Aaroflex is not entitled to offer. (Siblani Decl., Exhibit 1, Dkt. 132).

In the circumstances, the issue of correspondence between claim limitations 5 and 12 and defendants' Perfactory and Vanquish machines is material and disputed.

### Claim Limitations 6, 8–11 and 13

6. forming a first cross sectional layer of structure

8. forming successive layers of [medium] photopolymer adjacent to any

9. previously formed cross sectional layers of structure

10. forming and adhering successive cross sectional layers of structure to

11. any previously formed cross sectional layers

13. whereby a plurality of adhered Cross sectional layers of structure form the three dimensional object

It is undisputed that the three-dimensional object of defendants' Perfactory machine is built by the process of (1) curing a quantity[7] of resin and adhering it to a previously cured quantity of resin, (2) moving the build platform upwardly and (3) supplying a fresh quantity of resin beneath

---

7. The term "quantity" has the same meaning and practical effect of the word "layer" as used in claim 11 of the '981 Patent.

the previously solidified resin. In the Vanquish machine, the build platform moves continuously downward during the build process. As the platform moves downwardly, a quantity of resin is cured and integrated with the cured quantity of resin immediately below it. After curing, a fresh quantity of resin is supplied over the cured resin. The process repeats itself until the part is built.

This description of the manner in which the Perfactory and Vanquish machines operate confirms that their operation infringes claim elements 6, 8–11 and 13 of claim 11 of the '981 Patent. As to these limitations, I recommend that 3D's motion be granted.

## V. *INFRINGEMENT OF THE '934 PATENT*

■ Claim 2 of the '934 Patent reads as follows, with the claim terms numbered and the disputed terms appearing in bold face:

(1) A method for **stereolithographically forming a portion of a three-dimensional object**

(2) wherein a **subsequent layer** of the three-dimensional object

(3) is **formed over** (on top of) a

(4) **previously formed layer** of the object, comprising the steps:

(5) holding a volume of a building material having a working surface wherein the building material is capable of selective physical transformation upon **exposure to prescribed synergistic stimulation;**

(6) **forming a uniform coating of desired layer thickness over the previously formed layer,**

(7) including **sweeping a [smoothing element]** *winged blade* with sides that are at angles with respect to the surface of a material at least once across the upper surface of uncured building material to sweep away excess cured liquid and thereby create a uniform coating of

desired or predetermined thickness over the previously cured layer of building material.

(8) **over the previously formed layer**

(9) **said [smoothing element]** *winged blade* **having a plurality of substantially separate members** on a lower surface thereof for contacting the building material

(10) **applying a prescribed pattern of synergistic stimulation to the building material at the working surface to transform at least a portion of the building material**

(11) **to form the subsequent layer.**

By its plain meaning, claim 2 is limited to a stereolithographic process in which the three-dimensional object is dropped down into the liquid medium, with each layer being solidified on top of a previously solidified layer. Thus, 3D Systems' assertion of infringement of the '934 Patent claim 2 is made against defendants' Vanquish machines and not against defendants' Perfactory machines.

The invention of the '934 Patent claim 2 is the use of a smoothing member in the form of a winged blade that is swept across and in contact with the surface of the uncured building material to smooth and level the uncured building material before it is solidified or cured by the applied synergistic stimulation (light).

*Limitation 1*

A method for stereolithographically forming a portion of a three-dimensional object.

Envisiontec's assertion of non-infringement of the preamble is based on a narrowing claim construction that Judge Cohn and I both rejected. Envisiontec argues that the Vanquish machines do not "draw" upon a two-dimensional surface. However, by its plain words, the preamble is not limited to a moving light source. The

preamble covers both moving and stationary light sources.

### Limitations 2, 3, 4, 5, 10, 11

2. wherein a subsequent layer of the three-dimensional object

3. is formed over (on top of) [8] a

4. previously formed layer of one object comprising the steps:

5. holding a volume of a building material having a working surface wherein the building material is capable of selective physical transformation upon exposure to prescribed synergistic stimulation

10. applying a prescribed pattern of synergistic stimulation to the building material at the working surface to transform at least a portion of the building material

11. to form the subsequent layer.

As described in defendants' Tutorial dated March 17, 2009, each one of the Vanquish machines includes (1) a frame that houses a resin tank, (2) a build platform that moves downwardly without stopping, and (3) a single or dual digital light projector. As the build platform moves downwardly, uncured resin is supplied over the previously cured resin. A cooling blade moves intermittently across the upper surface of the uncured resin. The digital light projector includes an array of mirrors, each of which projects light of a particular intensity to a specific voxel location on the uncured resin for a predetermined time. When the resin is cured, the process repeats itself until the object is built. Clearly, the object is built layer-by-layer. Each layer may have voxels of different depths,[9] but layer shape is not a limitation of the claim.

8. The parentheses denote the Court's construction of the word "over".

9. Dr. Jacobs describes each of the voxels as having its own z-dimension analogous to a city skyline (Jacobs Decl., ¶ 8, Dkt. 134).

### Limitations 6, 7, 8, 9

6. forming a uniform (smooth, level) [10] coating (of uncured building material) of desired layer thickness over the previously formed layer.

7. including sweeping a [smoothing element] winged blade at least once

8. over the previously formed layer

9. said [smoothing element] winged blade having a plurality of substantially separate members on a lower surface thereof for contacting the building material

Defendants deny that the Vanquish machines meet any of the foregoing limitations 6–9. 3D Systems first argues that the denial comes too late: defendants failed to contest these limitations in their final, post-Markman interrogatory responses. Thus, according to 3D Systems, the presence of these limitations in the Vanquish machines should be deemed admitted facts or, in the least, reason alone to defeat defendants' motion for summary judgment of noninfringement.

While it is true that defendants failed to contest these limitations in their interrogatory responses, defendants did place 3D Systems on notice of their arguments of noninfringement in their summary judgment motion papers filed August 4, 2008. See, e.g., Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment of Non–Infringement of U.S. Patent Nos. 5,630,981, 5,902,537, 4,999,143 and 5,651,934, paras. 81, 84–85 and the accompanying Siblani and Shkolnik declarations. Hence, I do not recommend the grant of plaintiff's motion or a denial of defendants' motion under Fed. R.Civ.P. 37(c)(1).

10. Parentheses denote the Court's construction of the term "uniform."

It seems clear and not really disputed by defendants that the cooling blade used in the Vanquish machine has a winged blade design with two substantially separate members. (See, Transcript of Summary Judgment Hearing at 116). To have infringement, the cooling blade of the Vanquish machine must (I) be in contact with the uncured resin, (2) pass over the previously formed layer at least once and (3) form a smooth level coating of uncured resin of a desired layer thickness.

The foregoing operation and functioning of the cooling blades are disputed issues of material fact. A video of the cooling blade in action seems to show that the blade contacts the uncured resin to smooth it (Dkt. 104-9-3), but a jury, not I, should make this determination. Likewise, whether the cooling blade passes over the previously formed resin layer at least once is a question of fact to be resolved by a jury. I recommend that the parties' motion as to limitations 6, 7, 8 and 9 be denied.

## VI. INFRINGEMENT OF THE '537 PATENT

Claim 81 of the '537 Patent, with the claim terms numbered and the disputed terms appearing in bold face, reads:

(1) An apparatus for **forming at least a portion of a three-dimensional object**

(2) on a substantially **cross sectional basis**

(3) from a material capable of physical transformation upon **exposure to synergistic stimulation,** comprising:

(4) **means for supplying data descriptive of the object;**

(5) a container for containing a volume of material having a working surface;

(6) **an applicator**

(7) for **forming layers** of material

(8) **over at least portions of previously formed object cross sections,** the applicator having a bottom opening located in proximity to the working surface;

(9) a **vacuum pump** coupled to the applicator for drawing up material from the working surface through the bottom opening and into the applicator;

(10) **means for sweeping the applicator across at least a portion of at least some of the previously formed object cross sections;**

(11) a **source of synergistic stimulation**

(12) for **exposing the layers according to the descriptive data** to form the at least portion of the object from

(13) a **plurality of object cross sections.**

Although claim 81 is cast in apparatus format, the '537 Patent, like the '934 Patent, is directed to the coating step in a stereolithography process in which the three-dimensional object is dropped down into the liquid medium, with each layer being solidified on top of a previously solidified layer. Thus, 3D Systems' assertion of infringement is limited to the Vanquish machines.

### Limitations 1–3, 5 and 11

To the extent these are general limitations found in stereolithographic systems, they are present in defendants' Vanquish machines.

### Limitations 4, 12, 13

4. Means for supplying data descriptive of the object

12. for exposing the layers according to the descriptive data to form the at least portion of the object from

13. a plurality of cross sections.

As construed by the Court, the means referred to in limitation 4 is a computer or equivalent that supplies data that is descriptive or representative of adjacent cross sectional layers of the object. According to 3D Systems, the data bits in each bitmap identify the voxel and the

intensity of the light reflected onto the resin at each voxel location. Each bitmap thus represents a layer or thickness of voxels. The means for delivering the bitmaps is the Perfactory Software Suite.

As noted earlier in this report, 3D Systems has argued the patentability of its stereolithographic process by distinguishing its process from prior art systems which convert CAD/CAM data into defined data points that translate into cubic voxels. A jury should thus decide the impact, if any, of 3D's patentability arguments on its infringement claims.

In the circumstances, genuine issues of material fact exist as to whether the Vanquish machine meets limitations 4, 12, 13.

### Limitations 6, 7 and 8

(6) an applicator

(7) for forming layers of material

(8) over at least portions of previously formed object cross sections, the applicator having a bottom opening located in proximity to the working surface.

The parties have agreed that the term "applicator" means a device that applies and smoothes the building material. It is undisputed that the cooling blade in the Vanquish machine does not dispense uncured building material. Its acknowledged function is to cool the uncured building material and, as 3D Systems argues, to smooth the uncured building material. The infringement issue thus reduces to the meaning of the term "applies."

Envisiontec argues that the term "applies" means "dispense" and accordingly there is no infringement. 3D Systems responds that the cooling blade in the Vanquish machine applies and smoothes the building material in the same way a butter knife applies and smoothes butter on a piece of toast. 3D Systems also argues that the terms "apply" and "dispense" have and should be given different meanings under the claim differentiation theory,

viz, "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims" *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 48 USPQ 2d 1001 (Fed.Cir.1998). To this end, 3D Systems points to claims 15, 19 and 82 which use the word "dispense" to describe the function of the applicator.

I find that Envisiontec has the better argument. In the context of the invention of the '537 Patent, "apply" and "dispense" have the same meaning. The inventions of the '537 Patent are improved methods and apparatus for "providing a layer of building material adjacent to an already formed object cross-section" ('537 Patent, col. 13–18). In the Summary of the Invention, the terms "dispense" and "apply" are used to describe the delivery of uncured building material from above the object being formed (col. 5, ll 14–21).

The specification provides a clear meaning for and function of the terms "apply" and "dispense". They are one and the same. *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1582, 42 USPQ 2d 1777, 1781 (Fed. Cir.1997). The cooling blade of the accused Vanquish machine does not apply or dispense uncured building material. In the circumstances, there is no infringement of limitations 6 and 7.

### Limitation 9

9. A vacuum pump coupled to the applicator for drawing up material from the working surface through the bottom opening and into the applicator.

This claim limitation applies to a version of the Vanquish machine which includes (or included) a plastic tube connecting the cooling blade to a pressure regulator. An engineer, Alexander Shkolnik, who contributed to and is familiar with numerous aspects of the design of the Vanquish machines, has testified that the pressure regulator creates a pressure

within the cooling blade that is below atmospheric pressure. The lower pressure inside the cooling blade helps to increase the contact area between the resin and the cooling blade by pulling up the resin. He also testified that the negative pressure is used to remove bubbles from the surface of the resin.

The Court has defined vacuum pump to mean a device that creates a difference in pressure. In a declaration (Dkt. 137), Mr. Shkolnik seems to have changed his deposition testimony, stating that the Vanquish machine does not include a vacuum pump. While the machine may not have a "vacuum pump" as such, see Siblani Exhibit 66, (Env. 01526–27) it does have a device that creates a difference in pressure. Thus, at least one version of the Vanquish machine meets this limitation 9.

### Limitation 10

10. Means for sweeping the applicator across at least a portion of at least some of the previously formed object cross sections.

In the Vanquish machine, the cooling blade is moved intermittently by a system of dual rubber belts that are driven by a rotating shaft. As construed by the Court, the means of limitation 10 is a "motor-driven threaded drive shaft" as described in the '931 Patent. With dueling declarations, 3D Systems and Envisiontec claim that the use of a motor-driven belt drive to move the blade is and is not, respectively, an insubstantial variation of a motor-driven threaded shaft. Clearly, the issue of whether one system is an insubstantial variation of the other should be decided by a jury.

### VII. INFRINGEMENT OF THE '143 PATENT

■ Claim 35 of the '143 Patent reads as follows, with the claim terms numbered and the disputed terms appearing in bold face:

(1) [A]n apparatus for **producing a three-dimensional object** from a medium capable of selective physical transformation

(2) upon **exposure to synergistic stimulation**

(3) **from an object representation** specifying a first object surface to be spaced from a second surface by a spacing, and at least partially opposing the second surface, comprising:

(4) at least one **computer programmed to form a support representation**

(5) specifying a **removable support**

(6) to be **formed in said spacing out of a material substantially layer by layer,**

(7) said support to cross sectional width being **thin,** and comprising a solid which extends along a path connecting said second surfaces, the path having a vertical path component which is greater than any horizontal path component; and

(8) [**means for receiving said support representation, and for forming said three-dimensional object out of said medium substantially layer by layer and also for forming said support out of said material substantially layer by layer, in accordance with said object and support representations**];

### The Preamble (Limitations 1–3)

Limitations 1 and 2 are literally met by the Perfactory and Vanquish machines, each of which produces three-dimensional objects from a light-curable resin upon exposure to the light reflected by the DLP mirrors. As to the third limitation, this limitation means data that represents adjacent or successive cross sections of the object. As I have explained earlier, there exists a genuine issue of material fact as to whether the claimed data is the same as or equivalent to the three-dimensional points or bitmap data which identify and control the micromirrors of the DLP.

### Limitations 4 and 5

4. at least one computer programmed to form a support representation

5. specifying a removable support.

These limitations are met by the Perfactory and Vanquish machines. The Perfactory and Vanquish machines are sold with software ("Magics") that runs on a computer supplied by Envisiontec or the user. The software generates supports with teeth which are removable, not a part of the finished product, and provide reinforcement for the object.

### Limitation 6

6. to be formed in said spacing out of a material substantially layer by layer.

This limitation is met by the Perfactory and Vanquish machines. The iterative process that each employs to make a part is used to make the supports. As explained earlier in this report, this means that the support is built layer by layer.

### Limitation 7

(7) said support in cross-sectional width being thin, and comprising a solid which extends along a path connecting said first and second surface, the path having a vertical path component which is greater than any horizontal path component. As interpreted by the Court, "thin" means substantially smaller in width than in height to facilitate the easy removal of the support from the object. As shown on page 14 of this report, the support structures in the Vanquish and Perfactory machines include a base that is perforated in part with non-uniform diamond-shaped holes and teeth at the point of contact with the part to facilitate removal of the part from the support.

In contrast, the inventive supports of the '143 Patent are provided in the form of "webs". Webs, in cross section are long slender rectangular structures. The width of a web is designed thin enough to be easy to remove from the part after post curing. The length of a web is designed to meet two requirements: (1) long enough to give good adhesion to the elevator platform (without need of a base), and (2) long enough to span the cross-section of the object (to give support to cross-hatch and the boundaries enclosing it). ('143 Patent, col. 6, ll. 52–51).

A drawing of the support in the form of a web appears in the file history:

Clearly, the Vanquish support is not web-shaped and no part of the Vanquish support could be considered web-shaped. Thus, there is no infringement of the '143 Patent. Envisiontec also points to the requirement that the support comprise a

"solid," arguing that the perforated Vanquish support is not a solid. I find no reason to address this argument as it is subsumed by the rationale for my non-infringement finding.

### Limitation 8

*Element [8]:* means for receiving said support representation, and for forming said three-dimensional object out of said medium substantially layer by layer, and also for forming said support out of said material substantially layer by layer, in accordance with said object and support representations.

As the Court has construed these limitations: the means for receiving the support representation are the computer described at col. 8, ll. 39–59, which includes the CAD generator; the interface; the network communications such as an ETHERNET and the interface computer; forming the three-dimensional object out of the medium encompasses the fluid medium described at col. 4, ll. 56–63 and col. 10, ll. 21–22, and the sources of synergistic stimulation described at col. 4, ll. 48–55; and forming the support out of the material layer by layer in accordance with the object and support representations also encompasses the fluid medium described at col. 4, ll. 56–62 and col. 10, l. 21–22 and the sources of synergistic stimulation described at column 4, ll. 48–55.

Questions of fact preclude resolution of the question of infringement of element 8 for the following reasons:

### a. receiving the support representation

Based on the Court's claim construction of the means for receiving the support representation, the structure can include two computers (one which generates CAD support and one which controls the hardware of the machine—the interface computer) as well as an interface and ETHERNET connection to communicate between them.

Defendants argue that the Vanquish devices do not include a CAD generator or any computer that generates a CAD model. According to 3D Systems, Envisiontec instructs its customers on how to use an ETHERNET connection to transfer the support information between computers. When the Magics and Perfactory RP software are loaded onto a computer (e.g., a customer-provided PC or an Envisiontec-provided PC), the computer becomes a CAD generator, as the software specifically creates three dimensional models of the support structure.

Also according to plaintiff's expert, Dr. Stucker, if the Vanquish machine is configured in such a way that a single computer performs the CAD generator and interface computer operations, a one-computer set-up would have been an insubstantial variation from a two-computer, networked system as of the time of the April 18, 1988 filing date of the '143 Patent.

Given the parties' competing declarations, the jury should decide the issue of infringement.

### b. [forming] the three-dimensional object out of the medium

The Court found the structure for this portion of the claim element to include the source of synergistic stimulation described at col. 4, ll. 48–55, which states:

> Of course, it will be appreciated that other forms of appropriate synergistic stimulation for a curable fluid medium, such as particle bombardment (electron beams and the like), chemical reactions by spraying materials through a mask or by ink jets, or impinging radiation other than ultraviolet light, may be used in the practice of the invention without departing from the spirit and scope of the invention.

The Perfactory and Vanquish machines use a DLP to project light onto the micromirrors. In turn, the micromirrors reflect a grayscale value of light onto the curable resin at each voxel location.

**c. [forming] the support out of the material layer in accordance with the object and support representation**

The Court has found that this portion of the claim element requires the fluid medium described at col. 4, ll. 56–62 and col. 10, ll. 21–22. It is undisputed that the Vanquish machine includes such a fluid medium. Defendants instead contend that their machines "do not provide data representing adjacent cross-sectional layers." For the reasons explained earlier in this report, whether the Vanquish machines perform this step is a genuine issue of material fact.

### *CONCLUSION*

For the reasons explained in this report, I recommend the denial of both parties motions for summary judgment respecting the '981 and '934 patents and the grant of defendants' motion for summary judgment of non-infringement of the '537 and '143 patents.